IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 1:10-cr-00036-JAJ-CFB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| KENNETH D. WAITE, | ) | |
| | ) | |
| Defendant. | ) | |

The issue of restitution is before the Court for report and recommendation. By order entered July 20, 2011, Judge Jarvey referred the issue of restitution to the undersigned for Report and Recommendation. 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held July 26, 2011. The Government was represented by Assistant United States Attorney Craig Gaumer. Defendant, Kenneth Waite, appeared personally and was represented by his attorney, Joseph Hrvol. Following the hearing, the parties requested and were given additional time to submit written argument. Such argument has been received, and the matter is fully submitted.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 2, 2011, Mr. Waite pled guilty to one count of making a false statement in a loan application or renewal [47]. Mr. Waite was sentenced on May 23, 2011 to 18 months imprisonment followed by five years supervised release, with restitution to be determined at a later date [62].

Count 50 of the Indictment to which Mr. Waite pled guilty alleges the following:

> On or about March 5, 2005, in the Southern District of Iowa and elsewhere, Defendant Kenneth D. Waite knowingly made false statements for the purpose of influencing the action of Commercial Federal Bank, in that he submitted or caused to be submitted to Commercial Federal Bank the Relationship Approval Presentation and Executive Loan Summary seeking approval to renew and increase the Sullivans' existing revolving line of credit from $7,000,000 to $9,250,000. The Relationship Approval Presentation and Executive Loan Summary prepared by Defendant Kenneth D. Waite on the Sullivans' behalf failed to reflect the indebtedness of $1,870,000 that was outstanding on the "nominee loans" as of that date, and it falsely stated that the requested increase was "due to increasing capacity to 11,000 head of cattle on feed and $150/head increase in the cost of cattle over previous year," when in truth and in fact, Defendant Kenneth D. Waite then well knew such statement was false because the increase was needed, in significant part, to repay the "nominee loans" advanced to the Sullivans.

(Indictment [1] at 9.) Commercial Federal Bank was acquired by Bank of the West in December 2005 (collectively "the bank").

Mr. Waite was an agricultural and commercial loan officer and vice president with the bank in Woodbine, Iowa. Edward, Ryan, and Tina Sullivan were customers of the bank. When requesting a credit line increase on the Sullivans' account, Mr. Waite concealed the Sullivans' true financial condition and falsely stated the increase would be used to buy new cattle. The false statement made by Mr. Waite resulted in the bank increasing the line of credit on the Sullivans' account by $2.25 million, from $7 million to $9.25 million. The entire $2.25 million increase in the line of credit was drawn upon. Mr. Waite used funds from the credit line increase

2

to repay nominee loans. The bank would not have increased the Sullivans' line of credit if it knew about the nominee loans or the Sullivans' true financial condition.

The Sullivans were unable to pay the indebtedness and defaulted. On February 27, 2007 they and the bank entered into a liquidation agreement. The amount owing on the various notes was $6,311,724. The Sullivans agreed to liquidate and sell pledged/mortgaged real estate,[1] livestock, crops, machinery and equipment and pay the proceeds to the bank. They also agreed to pay the bank crop insurance and government payments due. (Gov't Ex. 1 at 3-4). In return the Sullivans were released from their indebtedness to the bank. The bank expected to receive about $3,040,000 leaving a balance on the indebtedness of slightly less than $3.3 million. The Sullivans performed their undertakings in the liquidation agreement and the bank ultimately charged off $3.3 million against a reserve for loan losses funded by a portion of its earnings. The charge-off was a loss to the bank.

**II.**

**DISCUSSION**

Under the Mandatory Victims Restitution Act ("MVRA"), the court "shall order" that the defendant pay restitution to the victim of "any offense committed by fraud or deceit." 18 U.S.C. §

---

[1] The Sullivans had the option to sell or refinance the real estate with the proceeds going to the bank. (Gov't Ex. 1 at 4). They refinanced.

3

3663A(A)(a)(1), (C)(1)(A)(iii). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution must be ordered." 18 U.S.C. § 3663A(a)(2). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant ..., shall be on the defendant." 18 U.S.C. § 3664(e). Courts must "order restitution to each victim in the full amount of each victim's losses ... and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). "The defendant need not have benefitted from the loss to the victim to be held responsible for restitution under MVRA." *United States v. Stout*, 597 F. Supp. 2d 963, 967 (S.D. Iowa 2009).

The MVRA does not expressly refer to a causal requirement, but a number of appellate courts have viewed the statute as incorporating such an element. *Stout*, 597 F. Supp. 2d at 969. Under this view the defendant's conduct must be a but-for cause of the loss and the causal link not too attenuated. *Id.* (citing *United States v. Cutter*, 313 F.3d 1, 8-9 (1st Cir. 2002)). An intervening cause may cut the causal connection. *Id.* (citing *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999)).

The Government takes the position that restitution is

4

owed by Mr. Waite to the bank in the amount of debt uncollected on the Sullivans' account and charged off, $3.3 million, or alternatively the amount of the credit line increase that would not have been granted but for Mr. Waite's false statements in the loan application, $2.25 million. Mr. Waite argues restitution should be denied in its entirety. He first argues the Sullivans defaulted because of a downturn in the cattle market and the unexplained loss of 3500 head of cattle which are intervening causes. Second, by entering into the liquidation agreement with the Sullivans and releasing their indebtedness the bank abandoned collection efforts leaving no ascertainable loss. Mr. Waite also contends the lack of supporting documentation for the values in the liquidation agreement detracts from its probative value.

The Government has established by a preponderance of the evidence the bank would not have increased the Sullivans' line of credit from $7 million to $9.25 million but for the false statements and omissions made by Mr. Waite on the loan documents. The entire $2.25 million increase was drawn upon. Had the credit line increase not been made, the bank's charge-off would have been that much less. Mr. Waite's criminal conduct was thus a but-for cause of the bank's loss in the amount of $2.25 million.

The Government claims restitution should be ordered for the entire charge-off of $3.3 million because the charge-off resulted from Mr. Waite's overall illegal scheme. The scheme

5

involved the payment of $4 million in nominee loans using the Sullivans' collateralized business income, money which should have been applied to the line of credit. Most of the credit line increase, about $1.8 million, was also used to pay nominee loans. The Government reasons that as a result of all this, the bank's exposure to loss on the Sullivan account was increased beyond just the amount of the addition to the line of credit, causally connecting the entire charge-off to Mr. Waite's offense.

The specific conduct for which Mr. Waite was convicted involved false statements to procure the credit line increase. The Eighth Circuit "take[s] a broad view of what conduct and related loss amounts can be included in calculating loss." *United States v. Waldner*, 580 F.3d 699, 710 (8th Cir. 2009)(quoting *United States v. DeRosier*, 501 F.3d 888, 896 (8th Cir. 2007)). But even so it is probably the case that without being propped up with the nominee loans the Sullivans' would have gone into default earlier with some loss to the bank. For this reason the charge-off above the $2.25 million credit line increase is causally attenuated and correspondingly the increase more directly connected.

A downturn in the cattle market and loss of cattle[2] would

---

[2] There was no evidence about market conditions at the restitution hearing. Perhaps there was at trial before the plea. At the restitution hearing bank Special Assets Division Vice President Michael Hogg opined that the collateral was overstated on certain reports to the bank and in its post-hearing brief the Government says this had to do with the number of cattle, citing trial testimony. (Gov't Brief [73] at 9-10). It was Mr. Waite's

not be intervening causes which would interrupt the causal chain. Market fluctuations and loss of livestock from a variety of causes are foreseeable risks to an agricultural bank lender, and would have been to Mr. Waite as an experienced loan officer. That is why in making loan decisions banks are careful about the amount they lend, the creditworthiness of the borrower, the intended use of loan proceeds, and the adequacy of collateral. Mr. Waite's false statements misled the bank into risks it would not have taken had it known the true facts. Its loss, to the extent impelled by market conditions and livestock losses, was a foreseeable consequence of Mr. Waite's criminal conduct. Also, the bank's loss was greater because of that conduct. It follows market conditions and livestock losses were not independent intervening causes of the bank's loss.

It is not significant that the bank released the Sullivans to secure their cooperation in the liquidation of the bank's collateral. Bank Special Assets Division Vice President Michael Hogg testified that typically the sale of collateral by the borrower, rather than the bank, is more productive because when the bank takes and sells the debtor's collateral it appears as a distress sale. Banking is a highly regulated industry. The bank had every incentive to maximize its return and to minimize its loss in

---

responsibility as the assigned loan officer to assure the accuracy of the Sullivans' representations about collateral. If the cattle were underreported, the reason is not shown in the restitution hearing record.

7

liquidating the Sullivans' collateral. Though Mr. Hogg was not involved in negotiating the liquidation agreement or fixing the value assumptions on which it was based, his descriptions of the bank's usual process and the attendant circumstances support a conclusion that the liquidation agreement was commercially reasonable. There is no basis to believe that the bank unreasonably failed to pursue an opportunity to collect more from the Sullivans, much less satisfy the debt.

The Court should find that the Bank of the West was directly and proximately harmed as a result of the offense for which Mr. Waite was convicted and that the amount of the bank's loss caused by defendant is $2.25 million. No recommendation is made as to the mode or method of payment as the subject was not addressed at the restitution hearing.

### III.

#### RECOMMENDATION

I **RESPECTFULLY RECOMMEND** Kenneth D. Waite be ordered to pay restitution to Bank of the West in the amount of $2.25 million.

IT IS ORDERED that the parties have **14 days** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Wade for Robinson v. Callahan, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of

the record to which the objections are made and must set forth the basis for such objections.  See Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357.  Failure to timely file objections may constitute a waiver of the right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994); Halpin v. Shalala, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); Thompson, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 2nd day of September, 2011.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE